JUDGE LINDSAY
delivered the opinion or the court.
December 29, 1871, Robert Atwood sold and assigned to Malcolm McNeil the promissory note of A. Shoefel & Co. Said note was for twelve thousand dollars. It bore date as above, and was due six months thereafter.
To secure the payment of this note Atwood transferred to McNeil certain securities, among them a certificate for twenty shares of the capital stock of the Bank of America. The transfer was made to Alexander, agent for McNeil, to whom was executed a power of attorney authorizing him to transfer the stock to himself upon the books of the bank. Alexander was induced to accept as security this certificate of stock by the production to him by Atwood of the following statement in writing, given by the cashier of the bank, viz.:
“ Louisville, Ky., December 29,1871.
‘ The twenty shares of stock owned by R. Atwood in Bank of America, represented by certificate No. 107, is unencumbered, and this bank has no claim on the same, and releases all claim for six 'months.
Clinton McClarty.”
On the 2d of July, 1872, when the note of A. Shoefel & Co. *57 matured, one thousand dollars were paid, and a new note for eleven thousand dollars, due in sixty days, executed. This note was also made payable to Atwood, and by him indorsed to McNeil. The pledge of the bank-stock was continued to secure its payment.
May 27, 1872, Atwood contracted a debt to the Bank of America for the sum of five thousand dollars, and on the 7th of August, 1872, another debt for the same amount.
About the 27th of that month he failed in business. A. Shoefel & Co., of which firm he was a member, also became insolvent about the same time. As soon as the fact of Atwood’s failure became public Alexander applied to the bank to be allowed to transfer the bank-stock to himself, as he was authorized to do by the terms of the power of attorney indorsed on the certificate. The bank refused to allow the transfer to be made. Such other collaterals as were held by McNeil were sold, and the proceeds applied to the satisfaction of the eleven thousand dollar note. A large balance remaining unpaid, he instituted this action, making the Bank of America a party defendant, and asking judgment against it for the market value of the twenty shares of stock, claiming that the refusal of the bank to allow the transfer was in effect a conversion of the stock.
The bank answered, setting up its claims against Atwood, and insisting that its charter gave it a lien upon the stock superior to any right acquired by McNeil under and by virtue of the transfer to his agent of the certificate.
It is not seriously insisted that the cashier of the bank did not have actual knowledge of the transfer to Alexander at the time the loan of May 27, 1872, was negotiated; but the proof does not show actual knowledge upon the part of any officer of the bank of the continuance of the pledge to secure the eleven thousand dollar note at the time of the negotiation of the loan made on the 7th of August, 1872.
*58 The provision of the charter under which the bank claims its superior lien is in these words: “ The stock shall be deemed personal property, and shall be assignable only on the books of the bank, upon such rules as the board of directors shall from time to time establish; but said corporation shall have a lien on the stock to secure any indebtedness by the stockholder to said corporation.” The indebtedness this lien is intended to secure is such as may exist at the time the stockholder attempts to dispose of his stock. It is manifest that the lien can not become effectual for any purpose until the stockholder contracts a debt to the bank. Until this is done his power to sell, give, devise, or encumber his stock is as perfect and complete as is his right so to dispose of or encumber any other personal property he may own.
He can not pass the complete legal title to his stock except by a transfer entered upon the books of the bank, nor can he by any arrangement not made known to the bank deprive it of the right to look to his stock as an ultimate security for the payment of any indebtedness it may innocently permit him to incur; but he may by bargain and sale, by gift, devise, or pledge, divest himself of title, and when he has done so, and notice has been given to the bank, it has no right to extend credit to him upon the faith of its charter lien upon his stock.
The assignment to Alexander of the certificate, with power to transfer to himself, on the books of the bank was a symbolical delivery of the stock. The transfer upon the books would have made perfect his evidence of title, but as to all persons having notice of his contract with Atwood it would have invested him with no greater interest than he then held. Had he made the transfer as he had the right to do, of course from that time forward the bank would have had no pretense for extending credit to Atwood upon the faith of the stock being bound to it for the payment of his debts. So if it loaned him money with actual knowledge of McNeil’s rights, it can *59 occupy no more favorable attitude than it would have done had Alexander exercised his right to make the transfer before the loans were made.
If it be true that McNeil acquired only an equity by the transfer of the certificate to his agent, we see no reason why the bank shall not be affected by notice of that equity. The general rule is that notice of an outstanding equity applies to every one whose title comes to him affected with such notice; and there is nothing in the charter of the Bank of America relieving it from the operations of this rule.
But it is insisted that notice to the cashier was not notice to the bank. We will not inquire whether in all cases the knowledge possessed by the cashier in this instance would be imputed to the corporation for which he acts. Here it certainly should be. By section 24 of the by-laws of this bank the cashier is made a member of the exchange committee. This committee is charged with the duty of buying and selling bills, notes, and other evidences of debt, and of discounting paper offered to the bank for discount. Nothing to the contrary being shown, it must be presumed that McClarty was present when the two notes of Atwood were passed upon. He was then acting for the bank in the discharge of his official duties, and it is difficult to perceive upon what ground the principal can be held not to have had notice of a fact then within the personal knowledge of one of its chosen agents and representatives. It was the duty of McClarty to have disclosed to the other members of the committee the facts known to him: We presume he did so; but if he did not, and a loss must result from his failure so to do, it should fall upon the party for whom he acted, and not upon a stranger in no wise responsible for his failure.
Some difficulty attends the settlement of the question of notice as to the loan made to Atwood on the 7th of August. As before stated, the testimony does not show actual knowl *60 edge upon tbe part of any of the officers of the bank of the execution by Shoefel & Co. of the note for eleven thousand dollars, and the continuance of the pledge of the certificate of stock to secure its payment. The cashier certainly had such information as put him upon inquiry.as to the status of Atwood’s stock. He was apprised of. his indebtedness to McNeil and of the transfer of the certificate to his agent. He knew, or at least must be presumed to have known, that as matter of law McNeil’s claim to the stock would continue in existence until his debt was paid, unless he voluntarily relinquished it. Had proper inquiry been made, the fact of the renewal of the note and the continuance of the pledge would have been ascertained. Failing to make it, the bank can not be allowed to gain an advantage which it could not have claimed had it exercised proper diligence.
We attach no importance to the renewal of the note. It was merely a change of the evidence of indebtedness. The original indebtedness was not extinguished by its execution. There were no new parties to the note, and no new security taken to insure its payment. The renewal did not release or at all affect the original contract of pledge. The stock remained, as it had been from the beginning, bound for the payment of the loan made by McNeil on December 29, 1871. Appellee was under no obligation' to notify the bank of the fact of the renewal of the note, as it in no way affected its rights.
The limitation of six months inserted in the writing given by the cashier to Atwood as the time during which the bank would release its right to claim its charter lien is entitled to no weight in the settlement of the questions arising in this case. The pledge was made within the six months, and of this fact the bank had notice. From the time it was made and notice given the right of the bank to acquire a charter lien was subordinate to the rights of McNeil, and must so continue until his debt is paid, or until he releases his claim.
*61 The balance still due upon the note of Shoefel & Co. is greatly more than the market value of the twenty shares of stock. The bank has refused to allow the transfer to be made. This refusal greatly impairs the value of the stock. It practically deprives McNeil of the advantages that ought to accrue to him from his ownership of it. He can neither demand and receive the accruing dividends, nor be heard in the selection of the officers charged with the management of the affairs of the bank. He has the right to treat the action of the bank as a conversion of his property, and look to it for its value.
The judgment of the chancellor accords with the views herein expressed. It is therefore affirmed.